## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| KATRINA HAY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | **Case No. 3:24-cv-00608** |
| | ) | **Judge Aleta A. Trauger** |
| COMMUNITY HEALTH SYSTEMS, | ) | |
| INC. and ACCESS CENTER | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM

Before the court are Motions for Summary Judgment filed by defendants Access Center Services, LLC ("ACS") (Doc. No. 31) and Community Health Systems, Inc. ("CHSI") (Doc. No. 34). For the reasons set forth herein, ACS's motion will be granted in part, and CHSI's motion will be granted in its entirety.

## I.     LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, any party "may move for summary judgment, identifying each claim or defense . . . on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

By its very terms, Rule 56 anticipates "that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating

a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.* at 248.

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

In ruling on a motion for summary judgment, it is not the judge's function to make credibility determinations, "weigh the evidence[,] and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. In determining whether a genuine issue of material fact exists, the court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in that party's favor. *Id.* at 255; *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). However, the "mere existence of a scintilla of evidence in support of the" nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* The inquiry, therefore, "asks whether reasonable jurors could find by a preponderance of the evidence that the" nonmoving party is entitled to a verdict. *Id.*

## II.     PROCEDURAL HISTORY

Plaintiff Katrina Hay initiated this lawsuit on May 15, 2024, asserting claims for sex discrimination and pregnancy discrimination in violation of the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101 *et seq.*, and Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as amended by the Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k). (Doc. No. 1 at 1.) She also asserts claims for discrimination, retaliation, failure to accommodate, and failure to engage in the interactive process, in violation of

the Tennessee Pregnant Workers Fairness Act ("TPWFA"), Tenn. Code Ann. § 50-10-101 *et seq.*, and interference, retaliation, and failure to reinstate under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* The plaintiff sues both ACS and CHSI, asserting that they both employ 500 or more employees and that they acted as "joint employers and/or an integrated enterprise, each of which had the authority to, and did, determine the terms and conditions of Ms. Hay's employment." (Doc. No. 1 ¶ 25.)

Following the closure of discovery, both defendants filed their Motions for Summary Judgment, accompanied by Memoranda of Law (Doc. Nos. 32, 44), Statements of Undisputed Material Fact ("SUMFs") (Doc. Nos. 33, 45), and the evidentiary material cited in their SUMFs or Reply briefs (Doc. Nos. 31-1 through 31-11, 34-1 through 34-9, 48-1 through 48-4, 54-1 through 54-2). For its part, ACS concedes that it employed the plaintiff, but it argues that it is nonetheless entitled to summary judgment based on the undisputed facts. CHSI, while also "incorporat[ing] by reference and adopt[ing] the arguments set forth by ACS," argues that it should be dismissed from this case because it did not employ the plaintiff, or jointly employ the plaintiff with ACS, and that CHSI and ACS are not an "integrated enterprise." (Doc. No. 35 at 15, 14.)

The plaintiff opposes both motions (Doc. Nos. 43, 51), arguing substantively that material factual disputes preclude summary judgment for ACS, while also continuing to maintain that CHSI is jointly liable with ACS for employment discrimination. She also filed a Response to each defendant's SUMF (Doc. Nos. 42, 52), and additional or overlapping evidentiary material (Doc. Nos. 41-1 through 41-12, 51-1 through 51-3). Both defendants filed Reply briefs (Doc. Nos. 48, 53), and the plaintiff, with permission, filed a Surreply (Doc. No. 55) to address arguments allegedly raised for the first time in ACS's Reply.

### III.    ACS'S MOTION

#### A.    Facts[1]

ACS, among other activities, is responsible for coordinating medical transfers for patients from one CHSI-affiliated hospital to another CHSI-affiliated hospital or, if medically necessary, to a non-CHSI-affiliated hospital. To carry out these medical transfers, ACS is staffed with "Transfer Coordinators," all of whom are classified as either full-time, part-time, or "PRN"[2] employees.

Plaintiff Katrina Hay began working at ACS in January 2021 as a full-time Registered Nurse Transfer Coordinator. In her role as Transfer Coordinator, Hay reported to Jyothirmayee ("Jyothi") Challa (ACS Transfer Center Manager), who reported to Patricia Galbreath (Senior Director of Access Center), who reported to Jennifer McClure (Vice President of Access & Transfer Center Services for ACS).

Full-time coordinators, like Hay, typically work at least thirty-six hours per week, in three twelve-hour shifts, while part-time coordinators work two twelve-hour shifts, or twenty-four hours per week. (Doc. No. 31-4, Galbreath Indiv. Dep. 22–23.) The "regular shifts for RN transfer coordinators" are "7a-7p, 12 to 12, 12 noon to 12 midnight, and then 7p to 7a." (Doc. No. 41-4, Galbreath Rule 30(b)(6) Dep. 61.) According to Patricia Galbreath, no part-time Transfer Coordinators work less than twenty-four hours per week or "in some way other than two 12-hour shifts." (Galbreath Indiv. Dep. 24.) Hay, when she was employed as a full-time coordinator,

---

[1] The facts for which no citation is provided are drawn directly from the plaintiff's Response to ACS's Statement of Undisputed Material Facts (Doc. No. 42) and are undisputed, at least for purposes of summary judgment.

[2] "PRN" is an abbreviation of the Latin term "pro re nata," meaning "as needed" or "as the circumstances require. *See* https://www.merriam-webster.com/dictionary/prn. (*See also* Doc. No. 31-4, Galbreath Dep. 24 ("PRN means as needed.").)

worked a minimum of three twelve-hour shifts per week, either 7 p.m. to 7 a.m., noon to midnight, or 7 a.m. to 7 p.m. (Doc. No. 31-2, Hay Dep. 52–53.)

In addition, Hay often "picked up overtime" by working "short shifts." (*Id.* at 55.) She explained that the Transfer Coordinators were "so busy" that she and other coordinators were allowed to "come pick up whatever hours [they] could, let that be two hours, let that be four, let that be six, let that be eight. We were so short that – picking up shifts, they would let it be convenient for you because they needed so much staff to come in for the volume." (*Id.*)

Largely on that basis, the plaintiff purports to dispute that employees, whether full-time or part-time, were always required to work twelve-hour shifts, pointing to certain examples in the weekly schedules filed as an exhibit to her Response in opposition to ACS's motion. (Doc. No. 41-1.) Thus, for example, she asserts that the schedule for May 7 to June 17, 2023 shows "full-time Transfer Coordinator Amy Maddox working 3–6 shifts per week, including 5 shifts of less than 12 hours" over the course of that six-week period, and "full-time Transfer Coordinator Wendy Novak working 1 pm-7pm on May 28, 202[3]." (Doc. No. 42, Resp. to ACS SUMF ¶ 5.) However, the referenced schedule shows in each case that these employees also worked at least three full twelve-hour shifts during any week in which they also worked an overtime "short shift." (*See* Doc. No. 41-1 at 20; *see also* Doc. No. 31-8, Swift Dep. 46 (explaining that, although Novak did not request to work on May 28, 2023, "there must have been a departmental need . . . for her to come in that day" and noting that Novak had "already worked her 36-hour shifts [sic]" that week).) Similarly, the plaintiff states that the schedule for August 21 to September 24, 2022 shows "part-time Transfer Coordinator Diana Pettit working 2-4 shifts per week, including 3 shifts of less than 12 hours." (Doc. No. 42, Resp. to ACS SUMF 6.) Again, the referenced schedule shows that Pettit, as a part-time employee, worked at least two full twelve-hour shifts in any week in which she also

worked a short shift.

Further, as ACS explains, Transfer Coordinators regularly worked less than twelve hours per shift for a variety of reasons, including, but not limited to, picking up additional overtime shifts; assisting during a particularly busy shift; having a pre-scheduled doctor's appointment or other commitment; splitting a twelve-hour shift with another employee; or receiving approval for a medical accommodation that requires the employee to work less than a regular shift. (Galbreath Rule 30(b)(6) Dep. 64–65; Swift Dep. 27–28.) However, these instances are not considered part of the regular schedule. (Galbreath Rule 30(b)(6) Dep. 64; Swift Dep. 27.)

PRN employees are also expected to work twelve-hour shifts. (Galbreath Indiv. Dep. 24; Doc. No. 31-5, McClure Indiv. Dep. 21; Swift Dep. 23–24, 27.) As the plaintiff points out, during the period from May 7 to June 17, 2023, several PRN employees worked short shifts, even during weeks that they did not work any full shifts. (Doc. No. 41-1 at 20.) These PRN employees were scheduled very sporadically, however. For instance, Misty Mitchell worked 7:30 a.m. to 3:00 p.m. on May 9 and May 24 but did not work any other shifts during that six-week period; Chartisha Miller worked four full shifts, called in sick one shift, and worked five short shifts (7:00 a.m. to 12:00, 6:00 p.m. to 11:00 p.m., or 10:00 a.m. to 7:00 p.m.). (*Id.*) Abby Haywood worked one full shift and no others during the entire six weeks. (*Id.*) Latonya Bailey worked one full shift and one short shift during the same week, and no other shifts. (*Id.*) Demesha Anderson worked eighteen full shifts and two short shifts during the same period. (*Id.*) Aside from Galbreath's testimony that PRN employees were expected to work twelve-hour shifts, the parties have not presented any evidence as to these employees' availability to work or the terms of their specific PRN arrangements with ACS.

On July 14, 2022, Hay informed her ACS supervisors and Human Resources that she was pregnant. On January 28, 2023, Hay gave birth to her daughter. She notified ACS shortly thereafter. Hay was approved for FMLA leave from January 28, 2023 through April 12, 2023. She was also approved for leave under the Tennessee Maternity Leave Act ("TMLA") from January 28, 2023 through May 16, 2023.[3] At the time she went on leave, Hay was a full-time employee working remotely. For most of 2022, through the middle of October, Hay worked at least three full shifts per week, unless she took leave or requested days off (*see* Doc. No. 41-1 at 1–12), with three exceptions (*id.* at 3, 6, 9). In the months just prior to her taking leave, beginning in late October 2022 and continuing through January 28, 2023, Hay began working a somewhat more irregular schedule, insofar as there were five weeks during that roughly three-month period in which she worked two full shifts and two (or more) short shifts per week (rather than three twelve-hour shifts), up until she went on maternity leave. (*Id.* at 13–15.)

In late April 2023, Hay called Tina Swift to discuss Hay's anticipated return to work the following month.[4] During this call, Hay told Swift that she wanted to return to ACS "casually" and asked about working shorter hours than the normally required twelve-hour shifts. (Hay Dep. 132.) Swift allegedly told her that they were short-staffed and that there were "a couple of people who were sick that had part-time and/or PRN positions that were doing short shifts, and it was working really well." (*Id.*) According to Hay, Swift suggested that, if Hay was willing to change to a different "market," she could be "really flexible . . . and give [her] whatever hours [she]

---

[3] The TMLA permits eligible employees to take up to four months of unpaid, job-protected leave for pregnancy and related conditions, Tenn. Code Ann. § 4-21-408(a), more than the twelve weeks required by the FMLA.

[4] While Hay was on leave, her supervisor, Challa, left ACS to pursue other professional opportunities. By the time Hay sought to return to work, Swift had taken over the scheduling aspects of Challa's role.

needed." (*Id.*) Hay asked Swift how many hours she would need to work to keep her benefits. Swift responded that she would need to get back to Hay after discussing the matter with Galbreath. (*Id.* at 133.) According to Swift, she told Hay that they could "use all the help [they] can get on day shift," but she meant that she was "looking at the schedule" to get Hay back as a full-time employee. (Swift Dep. 62–63.) She acknowledged telling Hay that other Transfer Coordinators were working six- to eight-hour shifts on an "as-needed" basis. (*Id.* at 63.)

On April 27, 2023, Hay texted Swift to ask whether working three six-hour shifts per week would qualify as part-time, or whether she would need to work more than that. (Doc. No. 31-8 at 34.) Swift responded by directing Hay to call Galbreath to discuss her return-to-work plans. (*Id.* at 35.) Shortly after that (also in approximately late April 2023), Galbreath called Hay to ask if she was willing to work twelve-hour shifts; Hay stated that she could not work twelve-hour shifts but wanted to come back part-time or "casual PRN." (Hay Dep. 138–39.) Galbreath told Hay that she would get back to her.

On May 1, 2023, Galbreath emailed several supervisors and HR personnel, stating:

> Katrina Hay called me this week to discuss her return to work plan. She is requesting 18 hours with morning only shifts. This is not a position or a need that the Medical Access Center has. I offered her afternoon/evening and weekend alternatives, which she was open to. At this point, the Access Center cannot accommodate Katrina's requests. Not sure what needs to happen next.

(Doc. No. 31-4 at 30.) Jennifer McClure asked for clarification as to whether Hay was open or was *not* open to afternoon, evening and weekend shifts and also for confirmation that Hay wanted nothing longer than six-hour shifts. (*Id.*) Galbreath's answer, "Correct," means that she had intended to say that Hay was *not* open to afternoon/evening or weekend shifts (*Id.* at 29.) McClure responded:

> Thank you. Then we cannot accommodate these requests as we do not have posted shifts that meet these requirements. We will need to release her as she will not be returning from FMLA to a position due to her restricted requests.

(*Id.*)

      Matt Ingram, Human Resources Generalist, interjected at this point:

> Hold on, there are some questions that we need answers to first. This is the fi[r]st
> that I am hearing of her requesting for a reduced schedule to return to work. Why
> is she requesting a reduced schedule for when she returns after 5/16?

(*Id.*) McClure answered that Hay had a newborn and was "trying to navigate hers and her husband's schedules." (*Id.*) She added that she understood from Galbreath that it was "a daycare issue." (*Id.*) Galbreath echoed: "Matt ~ She is requesting reduced hours due to her new baby. I will let HR work directly with Katrina to answer any questions. I do not want to mis speak." (*Id.* at 25.)

      Ingram asked for how long Hay was requesting a reduced schedule and whether moving her to part-time was a possibility. He also asked whether there was "any type of flex schedule she would be able to work." (*Id.* at 23.) McClure answered, "The time of day (morning day shift only) and reduced hours (6 max) are both the issue. Our busy times are midday and evening. Not in the morning. We are currently overstaffed at that time and are not scheduling short shifts." (*Id.*)

      The same day, on May 1, 2023, Hay had a telephone call with Ingram, during which she told him she wanted to come back casually PRN, that she "didn't really know what [her] options are, what's going to work best for them and . . . for [her]," but that she wanted to "start slow" and "work [her] way up." (Hay Dep. 146.) According to Hay, Ingram told her he did not know why it would "ever be a problem" to "go casual PRN." (*Id.* at 147.) Hay testified that she had been told even before she went on leave that working PRN would not be a problem, and she asked him to "just let them know [she was] flexible" and to let her know "what works best for them." (*Id.*)

      Also on May 1, 2023, Hay sent a text message to Swift asking whether she had heard back from Galbreath. Swift forwarded the message to Galbreath. On May 2, 2023, Galbreath and Hay had the following text exchange:

*Galbreath*: Trina [Swift] sent me your text asking about your schedule. We have our call with HR tomorrow and your return is one of the items to discuss. As mentioned, we currently do not have a part time position or early morning need. We'll discuss options with HR and then follow up. Take care.

*Hay*: I spoke with HR yesterday. I'm willing to be flexible. I discussed with them all the different options, I don't need early mornings—that's just what would work best. There are days I can come in later on. I discussed this with them. Look forward to hearing from you.

*Galbreath*: Perfect. Please send [Swift] your schedule and we'll work on it. Are you still wanting only part time?

*Hay*: I want PRN to start back. My goal is to work back to full time. I will give [Swift] my availability.

(Doc. No. 31-2 at 118–19.)

On May 3, 2023, Hay emailed Swift as follows:

I am looking to come back PRN and ease back into full time.

To start for May and June I'd like to do 2, 6 hour shifts, by July my goal is to increase to 2, 8 hour shifts and then as things progress keep increasing my hours from there. I'd prefer not to work 2 days in a row.

I am available for 6 hour morning shifts pretty much any day of the week including weekends – 7am–1pm.

Monday, Tuesday, Wednesday and Thursday's I am available until 4pm – so I could do 10am–4pm. When I start to increase my hours we can probably figure out staying later.

I am flexible and willing to work with you to figure out the schedule.

(Doc. No. 31-4 at 33–34.) Swift forwarded Hay's email to Galbreath, who forwarded it to the Human Resources team.

According to Galbreath and other ACS representatives, the company did not have six-hour shifts available: "[W]e work 12-hour shifts. We had no open positions, and . . . even if we did, what she was offering didn't even meet the requirements. She offered six-hour shifts. We work 12 hours." (Galbreath Dep. 41; *see id.* at 51, 53; McClure Indiv. Dep. 31.)

On May 4, 2023, Stephanie Hall called Hay to inform her that ACS could not grant her scheduling requests but that her full-time RN Transfer Coordinator position (working three twelve-hour shifts per week) was available to her to return to at the conclusion of her leave. Hay told Hall that she had repeatedly communicated that she "cannot come back full time" and that she felt "discriminated against as a new mother." (Hay Dep. 161.) She conveyed that she was "hurt," that there was "no way [she] could come back full time," and that the company was "effectively firing [her]." (*Id.* at 161–62.) During this call, she also stated, "I wouldn't even know how to begin to start to return by equipment," before hanging up on Hall. (*Id.* at 162.)

Ginger Hearn, testifying as ACS's corporate representative on the topic of Hay's separation, was on the line and listening to Hay's conversation with Hall on May 4, 2023. (Doc. No. 31-3, Hearn 30(b)(6) Dep. 82.) She stated that ACS's take-away from the conversation was that Hay had resigned. (*Id.* at 80–81.) As Hearn explained:

> We didn't ask her to return her equipment. We offered her her full-time position that was held for her after her leave. . . .
>
> When she indicated that she was not going to return back to the full-time role that we offered to her and then said, "Where do I turn in my equipment?" we took that as her resignation . . . . I would say it's a combination [of the two statements].

(*Id.* at 81.)

On May 4, 2023, Hall memorialized the company's understanding that Hay had resigned in a written memorandum that stated:

> I spoke to Katrina [Hay] on May 4, 2023 to let her know that we are unable to accommodate the requests for the hours listed below. I also informed her that we have her full time position available for her to return to. She stated that she was not returning full time. She asked how to return her equipment.
>
> We will process this as a termination with a reason of "not returning for [sic] LOA."

(Doc. No. 31-6 at 31.)

Hay called Hall back the morning of May 5, 2023 to apologize for hanging up on her and to say that she was willing to work twelve-hour shifts but could not work three shifts per week. (Hay Dep. 162.) Hall did not call her back. (*Id.* at 163.)[5]

Instead, at 4:42 p.m. on May 5, 2023, Hall emailed Hay explaining that, since Hay had resigned on May 4, 2023 and therefore was not employed through the end of the calendar year, Hay owed back a pro-rated portion of her retention bonus. (Doc. No. 31-2 at 121.) Also on May 5, 2023, at 3:15 p.m., Matt Ingram emailed Hay a termination packet (*id.* at 122), which Hay concedes she "likely" opened the day it was sent (Hay Dep. 174–75).

ACS has not been able to identify a specific person who filled Hay's position following her separation from employment, even though ACS hired other full-time Transfer Coordinators after Hay left. (Galbreath Rule 30(b)(6) Dep. 8; Doc. No. 31-9, Hearn Indiv. Dep. 33.)

### B. Discussion

ACS seeks summary judgment on all claims asserted against it. It argues that (1) the THRA and TPWFA claims are barred by the statute of limitations; (2) Hay's FMLA interference claim fails because she received the full twelve weeks of FMLA parental leave to which she was entitled and was offered reinstatement to the position she held when she took leave; (3) her FMLA retaliation claim fails because she was offered reinstatement to her original position; (4) she cannot establish a *prima facie* case of pregnancy discrimination, for purposes of her PDA claim, or rebut ACS's proffered reasons for its actions; and (5) she cannot establish a *prima facie* case of retaliation in violation of Title VII or rebut ACS's proffered reasons for its actions.

---

[5] Hall does not recall receiving a voice message from Hay on May 5, 2023. (Doc. No. 31-6, Hall Dep. 59.)

The plaintiff filed suit on May 15, 2024, and she concedes that her claims under the THRA and the TPWFA are subject to a one-year statute of limitations. *See* Tenn. Code Ann. § 4-21-311(d); Tenn. Code Ann. § 50-10-104(c). The issue before the court is whether, as a matter of law, the plaintiff's THRA and TPWFA claims accrued more than one year before the plaintiff filed her Complaint.

The plaintiff testified that, when Stephanie Hall told her during the telephone call on May 4, 2023 that the company would only take her back full-time, which required working three twelve-hour shifts per week, the plaintiff responded as follows:

> I let her know how inhumane it was and how I was feeling discriminated against and that it was impossible and they knew that for me to come back full time and . . . [I] was always told it was going to be okay [to come back casual part time] and that they couldn't possibly be treating a new mother like this.
>
> And I do remember asking about the equipment. I remember me being so overwhelmed, like, how would I even return all this equipment? . . . Because, in my mind, they were firing me in that moment. Three 12-hour shifts, you know I can't do that.

(Hay Dep. 164–65.) Hay was "so upset" that she hung up on Hall without letting her finish. (*Id.* at 165.) Hay reiterated that her understanding at that moment was that "they were basically firing me in that moment, because they knew I couldn't come back for three 12-hour shifts, that it was going to be physically and mentally impossible for me." (*Id.*)

After speaking with her husband, Hay called Hall back the next morning to tell her that she was willing to work twelve-hour shifts, just not three per week. She asked that someone call her back so they could "work something out." (*Id.* at 170.) Instead of a call back, Hay received an email from Hall at 4:42 p.m. the same day, on May 5, 2023, that was about repayment of part of her retention bonus. (*See id.* at 185 ("That's the only response I ever got. I never got any response from my voicemail whatsoever.").) As set forth above, the email stated: "Since you resigned on

May 4, 2023, the amount you owe back is $833.28. You indicated on the phone that you would send a check." (*Id.* at 171.)

The plaintiff also received an email from Matt Ingram on the afternoon of May 5, 2023—so presumably after her morning telephone call to Hall—that stated: "Matt Ingram requests your signature on Katrina Hay termination." (Doc. No. 31-2 at 122.) The email contained her "separation packet." (Hay Dep. 172, 174.) The plaintiff "likely" opened the separation packet from Ingram the day she received it. (*Id.* at 175.)

These documents establish unequivocally that ACS considered Hay to have voluntarily resigned from ACS on May 4, 2023 or, alternatively, that ACS had decided no later than May 5, 2023 that it was terminating her as a result of her refusal of the offer to come back to work full-time. More importantly, the record establishes that ACS communicated to Hay no later than May 5, 2023 its conclusion that Hay's employment had terminated on May 4, 2023. The plaintiff attempts to avoid the implication of the notices she received on May 5, 2023 by arguing that she was waiting for Hall to respond to her telephone message about her willingness to work twelve-hour shifts and that she continued to "wait[] to hear from ACS and return to work on May 17, 2023," the day after her leave under the TMLA would expire. (Doc. No. 43 at 8.) Hay claims that she received a "Community Health Systems Employee Exit Survey" on May 15, 2023. (*Id.* at 9 (citing Doc. No. 41-12 at 1).) In addition, Ingram re-sent the separation packet on May 19, 2023 and again on May 26, 2023; the subject line of the email each time stated: "Reminder: Waiting for you to sign Katrina Hay Termination." (*See* Doc. No. 41-12 at 2; *see also id.* ("Matt Ingram has requested that this reminder be sent; This reminder will be re-sent every week until completed.").)

ACS argues that, because Hay unequivocally received notice no later than May 5, 2023 that ACS considered her employment to be terminated (irrespective of whether Hay resigned or

was terminated by ACS), but she did not file suit until May 15, 2024, she "cannot skirt the clear one-year statute of limitations that bar[s] her THRA and TPWFA claims." (Doc. No. 32 at 7.[6]) The plaintiff responds that there is a factual dispute as to whether she resigned or was terminated and that this dispute is material. She contends that she called Hall back the morning of May 5 to notify her that she was willing to work twelve-hour shifts, and then she "waited to hear back from Defendants." (Doc. No. 43 at 10.) She points out that she did not receive the "Exit Survey" until May 15, 2023 and claims that she was then "denied reinstatement on May 17," which she characterizes as "both her termination *and* an independent adverse action." (*Id.*) Hay insists that her claims are timely under both the TPWFA, which provides that a cause of action must be filed within one year of "the date of termination of employment or the date of the adverse employment action," Tenn. Code Ann. § 50-10-104(c), and under the THRA, which states that a civil action "must be filed . . . within one (1) year after the alleged discriminatory practice ceases." Tenn. Code Ann. § 4-21-311(d). She asserts in the alternative that she is entitled to equitable tolling, because ACS "misrepresent[ed] the circumstances surrounding the challenged employment action." (Doc. No. 43 at 11.) ACS's Reply asserts that any dispute as to whether Hay retired or was terminated is not material, because Hay unequivocally knew on May 5, 2023 that ACS considered her employment to have terminated on May 4, 2023. (Doc. No. 48 at 2.)

"State law (not federal law) determines the accrual date of state claims in federal court." *Coleman v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 130 F.4th 593, 604 (6th Cir. 2025). And, under Tennessee law, it is clear that the plaintiff's state law claims are time-barred. More specifically, the Tennessee Supreme Court has held that "a discriminatory termination ceases and is complete,

---

[6] ACS did not paginate the first page of its Memorandum or Reply, as a result of which the page numbers applied by CM/ECF differ from the page numbers supplied by the defendant. The court employs the CM/ECF pagination.

when the plaintiff is given unequivocal notice of the employer's termination decision, even if employment does not cease until a designated date in the future." *Weber v. Moses*, 938 S.W.2d 387, 391–92 (Tenn. 1996) (citing *Chardon v. Fernandez*, 454 U.S. 6 (1981); *Del. State Coll. v. Ricks*, 449 U.S. 250 (1980)). In *Weber*, the plaintiff received oral notification that his employment contract would end in three weeks. The Tennessee Supreme Court affirmed the dismissal of the plaintiff's THRA claim as time-barred on the basis that the limitations period began running on the date the plaintiff received notice that his employment would end, rather than three weeks later, on the date his employment actually ended. *Id.* at 393.

In reaching that conclusion, the court expressly rejected the plaintiff's argument that his oral notification was not "definite and final," in part because, aside from the admittedly unequivocal notice (that the company had "decided to terminate his sales manager contract effective August 31, 1992," *id.* at 388), the plaintiff's email requesting reconsideration of the "decision to terminate [his] Sales Manager contract" "revealed [the plaintiff's] awareness that [the employer] *previously* had decided to terminate his sales manager contract." *Id.* at 392. In addition, the plaintiff stated in an affidavit that he "continued to *hope*" that he would not be terminated until he received "written *verification* of [his] termination," which further established that he was aware of the decision and only hoped for reconsideration. *Id.* (emphasis in original). The court stated: "An employee's hope for rehire, transfer, promotion, or a continuing employment relationship cannot toll the statue of limitations absent some employer conduct likely to mislead an employee into sleeping on his rights." *Id.*

Here, the plaintiff claims that she believed that Hall was "firing [her], essentially," during their May 4, 2023 telephone call, during which Hall "just kept saying, 'If you're not going to come back for three 12s, then you have to return your equipment . . . . You have to pay us all this money

back." (Hay Dep. 195.) Hay hung up on Hall. She called her back the next morning to say that she would be willing to work twelve-hour shifts, but not three per week—in other words, not full-time. (*Id.* at 161–62.) The only response the plaintiff received in response to her message was (1) Hall's May 5 email, stating that, in light of Hay's resignation on May 4, 2023, she owed back to the company part of her retention bonus, which the plaintiff acknowledged having discussed with Hall on the previous day's telephone call and "probably" telling Hall she would send the payment by check (*id.* at 171); and (2) Matt Ingram's May 5, 2023 email, stating, "Matt Ingram requests your signature on Katrina Hay termination" (*id.* at 172). In other words, the plaintiff received unequivocal notice from ACS on May 5, 2023 that it considered her employment to have terminated on May 4 , 2023. The plaintiff's unilateral hope that the company would respond favorably to the message she had left for Hall on the morning of May 5, 2023, offering to come back to work part-time, was simply not sufficient to extend the limitations period, "absent some *employer conduct* likely to mislead an employee into sleeping on [her] rights." *Weber*, 938 S.W.2d at 392 (emphasis added). Here, there was no conduct on the part of ACS that could have misled the plaintiff. The fact that ACS kept sending additional documents that reconfirmed the termination decision did not suggest either that the alleged wrongful conduct was ongoing or that ACS had reconsidered that decision.

Likewise, the fact that the plaintiff's unpaid leave under the TMLA was not set to expire until May 17, 2023 did not extend the limitations period, given that the plaintiff knew as of May 5, 2023 that ACS considered her employment to have terminated. *Accord Holcomb v. Sverdrup Tech., Inc.*, No. M2000-00536-COA-R3-CV, 2001 WL 1386093, at *3 (Tenn. Ct. App. Nov. 8, 2001) ("[N]otice of the termination provides knowledge of the injury; the fact that employment may continue beyond the date of the notice does not mean that the employee gains reasonable

knowledge of the adverse action only when employment actually ceases.").

The case on which the plaintiff relies does not compel a different conclusion. In *E.E.O.C. v. United Parcel Serv., Inc.*, 249 F.3d 557 (6th Cir. 2001), the court recognized that the "limitations period does not begin to run on a claim for employment discrimination until an employer makes and communicates a final decision to the employee" and that, "[o]nce the employee is aware or reasonably should be aware of the employer's decision, the limitations period commences." *Id.* at 561–62 (citing Ricks, 449 U.S. at 258). That case involved an "on-going interactive process" of finding an accommodation, and the plaintiff's claim did not accrue until that process was complete. *Id.* at 562. In this case, to the contrary, there were no ongoing discussions after the May 4 telephone call, and the plaintiff's claim that she was still waiting for a response to her voice message, despite repeated communications from ACS that it considered her employment to have ended, was not reasonable.

The plaintiff's claim that there is a distinction between "the date of termination of employment" and "the date of the adverse employment action," for purposes of Tenn. Code Ann. § 50-10-104(b), and her evocation of the "date the alleged discriminatory practice ceases," under Tenn. Code Ann. § 4-21-311(d), are also unavailing. The plaintiff was notified on May 5, 2023 that ACS believed her employment had terminated on May 4, 2023. It never reversed course from that position, and its repeated communications about that determination did not extend the limitations period and did not constitute continuing discrimination. The date on which Hay's TMLA leave was otherwise set to expire did not constitute a separate adverse employment action, because the plaintiff's employment had already terminated before May 16, 2023.

In sum, the court concludes that the limitations period for the plaintiff's state law claims began to run no later than May 5, 2023, when Hay knew of the defendant's position that her

employment had terminated as of May 4, 2023. Regardless of whether Hay resigned or was terminated, her THRA and TPWFA claims, filed on May 15, 2024, are untimely unless saved by some form of tolling.

The plaintiff invokes equitable tolling, but the facts do not support the plaintiff's assertion that ACS misrepresented the circumstances surrounding the termination of the plaintiff's employment. Moreover, the Tennessee Supreme Court, "unlike other state courts and the federal courts," has declined to recognize "the doctrine of equitable tolling in civil cases." *Redwing v. Catholic Bishop for Diocese of Memphis*, 363 S.W.3d 436, 460 (Tenn. 2012). The Tennessee Supreme Court did hold that equitable estoppel and fraudulent concealment may toll the running of the statute of limitations, but equitable estoppel requires proof that "the defendant has misled the plaintiff into failing to file suit within the statutory limitations period" by engaging in affirmative misconduct to "induce the plaintiff to delay filing suit." *Id.* (citations omitted). And fraudulent concealment requires proof that the defendant "has taken steps to prevent the plaintiff from discovering he [or she] was injured." *Id.* (citation omitted). The plaintiff has offered no such proof in this case.[7]

The plaintiff's state-law claims, therefore, are time-barred and subject to dismissal on that ground.

---

[7] Hay cites an email exchange between counsel in support of her estoppel argument, but she did not attach the cited emails to her Response. The defendant attached them to its Reply. In this email exchange, which took place on March 4–5, 2024, before the plaintiff filed suit, counsel for the defendants stated: "[Hay] certainly could have gone PRN at the time, but she chose not to and sent in her resignation. I think your client is confused." (Doc. No. 48-2 at 4.) Plaintiff's counsel responded that Hay had emailed Swift on May 3, 2023, telling her that she was "looking forward to com[ing] back PRN and eas[ing] back into full time." (*Id.* at 3.) Plaintiff's counsel added: "That is the same day CHS/ACS claims Ms. Hay quit." (*Id.*) In other words, counsel for both parties agreed that ACS had taken the position that Hay resigned (though on May 4 rather than May 3). That discrepancy aside, nothing about this exchange suggests that ACS somehow induced the plaintiff to delay filing suit until after the limitations period expired.

### 2. FMLA Claims

The Complaint asserts that ACS violated the FMLA by (1) "interfering with Ms. Hay's exercise of her rights under the FMLA" and "failing to reinstate Ms. Hay [to] her position and benefits or an equivalent position and benefits at the end of her medical leave"; (2) "discriminating and retaliating against Ms. Hay because she opposed this denial of her full medical leave rights; and (3) "discriminating and retaliating against Ms. Hay for exercising her rights under the FMLA by taking full medical leave." (Doc. No. 1 ¶¶ 77–79.) In other words, the plaintiff articulates both interference and retaliation claims.

### a) Legal Framework

The Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*, generally entitles eligible employees to take twelve "workweeks" of leave during any twelve-month period for certain specified events, including the birth of a child. 29 U.S.C. § 2612(a)(1)(A). The employee, "on return from such leave," is also entitled to be "restored by the employer to the position of employment held by the employee when the leave commenced" or to "an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment." *Id.* § 2614(a)(1)(A) & (B).

Covered employers are prohibited from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or the attempt to exercise," the rights accorded by the FMLA. *Id.* § 2615(a)(1). In addition, it is "unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *Id.* § 2615(a)(2), (b). Section 2617 provides for the enforcement of these provisions.

There are "[t]wo distinct theories of recovery" under the FMLA: an entitlement theory, also referred to as interference theory, and a retaliation theory. *Edgar v. JAC Prods. Inc.*, 443 F.3d 501, 507 (6th Cir. 2006) (citing *Arban v. West Publ'g Corp.*, 345 F.3d 390, 400–01 (6th Cir.

2003)). Under the interference/entitlement theory, "[t]he issue is simply whether the employer provided its employee the entitlements set forth in the FMLA—for example, a twelve-week leave or reinstatement after taking a medical leave." *Id.* (citing *Arban*, 345 F.3d at 401). The right to reinstatement is the "linchpin" of this theory because "the FMLA does not provide leave for leave's sake, but instead provides leave with an expectation [that] an employee will return to work after the leave ends." *Id.* (citations omitted).

> Thus, to prevail on an entitlement claim, an employee must prove that:
>
> (1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled.

*Id.* (citations omitted). The employer's intent is not a relevant part of the inquiry. *Id.*; *see also Jaszczyszyn v. Advantage Health Physician Network*, 504 F. App'x 440, 447 (6th Cir. 2012) (holding that plaintiff's FMLA interference claim failed because she had been given all the leave to which she was entitled). The FMLA does not include a reasonable accommodation requirement. *See Tillotson v. Manitowoc Co.*, 727 F. App'x 164, 170 (6th Cir. 2018) (citing *Smith v. City of Niles*, 505 F. App'x 482, 485 (6th Cir. 2012)); *accord, e.g.*, *Macfarlan v. Ivy Hill SNF, LLC*, 675 F.3d 266, 271–72 (3d Cir. 2012) ("The FMLA does not require 'an employer to provide a reasonable accommodation to an employee to facilitate his return to the same or equivalent position at the conclusion of his medical leave.'" (citing *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375 (3d Cir. 2002)). Further, the FMLA is not to be "construed to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B).

FMLA retaliation claims (as distinct from interference claims) are analyzed under the familiar *McDonnell Douglas* burden-shifting framework when the plaintiff relies on indirect evidence. *Donald v. Sybra, Inc.*, 667 F.3d 757, 762 (6th Cir. 2012) (citing *Edgar*, 443 F.3d at 508). Thus, the employee must establish a *prima facie* case to support her claim. If she does so, the burden shifts to the defendant to offer a legitimate non-discriminatory reason for its action. The burden then returns to the plaintiff to prove that the proffered reason is pretext for retaliation. To establish a *prima facie* case of retaliation, the plaintiff must show that

> (1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Jaszczyszyn*, 504 F. App'x at 447 (citing *Killian v. Yorozu Auto. Tenn., Inc.*, 454 F.3d 549, 556 (6th Cir. 2006)). Under this theory, the employer's motive may be relevant, "because 'retaliation claims impose liability on employers that act against employees specifically because those employees invoked their FMLA rights.'" *Id.* (quoting *Edgar*, 443 F.3d at 508).

As the Sixth Circuit has explained, interference and retaliation claims differ somewhat in focus:

> What makes the employment decision unlawful under the [retaliation] theory is the motive of the employer—namely, that the action was taken because the employee exercised, or complained about the denial of, FMLA-protected rights. Because the *McDonnell Douglas* burden-shifting framework applies to retaliation claims, employers will point to evidence of the employee's medical condition as a legitimate, nondiscriminatory reason for the employment decision. The time at which the evidence arises thus becomes a crucial factor in discerning the employer's motive.
>
> . . . .
>
> Employers, in other words, are still permitted to cite the . . . evidence available prior to the employment decision as a legitimate, nondiscriminatory basis for taking an adverse action against an employee otherwise eligible for the 12–week leave period.

*Edgar*, 443 F.3d at 512–13 (internal citations omitted).

b)  *Hay's Interference Claim*

ACS argues that the plaintiff's FMLA interference claim fails because it is undisputed that the plaintiff received all the FMLA leave to which she was entitled and that she was offered reinstatement to the same position, with identical pay and benefits, that she held prior to taking leave. (Doc. No. 32 at 8.) Similarly, ACS argues that, because it held her job for her and offered to reinstate her to the position she held before taking leave, Hay cannot prove an adverse employment action for purposes of her FMLA retaliation claims. ACS also argues that, insofar as Hay is claiming that ACS violated the FMLA by refusing her requests for a modified schedule, the claim fails because the FMLA does not contain a reasonable accommodation requirement.

In response, the plaintiff apparently does not contest that she received twelve weeks of FMLA leave and that she was offered reinstatement to the job she held prior to taking leave. She argues instead that the FMLA provides broader protection than the defendant suggests, as it only requires a showing that the employer "discouraged the exercise of FMLA rights." (Doc. No. 43 at 16 (quoting *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)).) She argues that ACS violated the FMLA by discouraging her from using FMLA leave, thus forcing her to "fight for her full leave for nearly four months." (*Id.*) ACS denies discouraging the plaintiff from taking FLMA leave but contends that, even if there is a factual dispute on that point,[8] it is not material, because the record establishes that Hay's FMLA requests were always approved, both for intermittent leave in 2022, during her pregnancy, and for maternity leave in 2023. (*See* Doc. No. 48 at 5 n.5 (citing

---

[8] ACS points to evidence in the record that ACS employees greeted the plaintiff's announcement of her pregnancy with enthusiasm, including Stephanie Hall's response email in which Hall gushed, "This is exciting news!!! Congratulations!!!" and advised Hay to reach out to the FMLA team. (*See* Doc. No. 31-2 at 106.)

Hay Dep. 98–101, 119–24; Doc. No. 48-3 at 2, 5–6, 12–13, 17–18).)

The court finds the plaintiff's "discouragement" theory of recovery to be without merit under the circumstances presented here. While the Sixth Circuit has recognized that "unlawful interference could occur when an employer merely attempts to 'discourag[e] an employee from using [FMLA] leave,'" it is also clear that "the employee must, in all cases, show that their employer's interference prejudiced them, or 'caused them harm,' within the meaning of the statute." *Vonderhaar v. Waymire*, 797 F. App'x 981, 990 (6th Cir. 2020) (first quoting 29 C.F.R. § 825.220(b); then citing *Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014)); *see also Edgar*, 443 F.3d at 507–08 ("[T]he FMLA is not a strict-liability statute. Employees seeking relief under the entitlement theory must therefore establish that the employer's violation caused them harm." (internal citations omitted; citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)). Thus, irrespective of whether ACS discouraged the plaintiff from taking leave, the fact remains that Hay's requests for leave were ultimately granted, so she cannot show that she suffered harm as a result of the alleged discouragement. Without harm, the plaintiff cannot prove an FLMA interference claim based on "discouragement."

Hay also maintains that she was *not* actually offered reinstatement to her pre-leave position, because she was not offered to return to the "agreed-upon flexible schedule" she had enjoyed prior to taking leave. (Doc. No. 43 at 17.) ACS argues that this argument is "pure speculation" in support of which Hay offers no evidence (Doc. No. 48 at 6–7). The court agrees. It is undisputed that Hay was working full-time before taking leave and that a full-time position was considered to be three twelve-hour shifts per week. (Galbreath Indiv. Dep. 22–23; Hay Dep. 52–53.) That schedule, for her and other employees, varied somewhat according to necessity, with employees taking personal leave for medical appointments, illness, vacation time, and so forth. (Galbreath Rule 30(b)(6) Dep.

64–65; Swift Dep. 27–28.) In addition, Hay and other employees occasionally picked up overtime, including "short shifts," in addition to their three twelve-hour shifts. (Hay Dep. 55; Doc. No. 41-1 at 20; Swift Dep. 46.) The plaintiff offers nothing but speculation to support her claim that the full-time position as offered would not have been equivalent to the position she held before taking leave, with the flexibility enjoyed by all full-time Transfer Coordinators.

In sum, because the plaintiff cannot show that she was denied FMLA benefits to which she was entitled, her FMLA interference claim fails.

### c)    Retaliation Claim

ACS, without actually raising the *McDonnell Douglas* burden shifting analysis, argues that that the plaintiff cannot establish a retaliation claim, first, because she did not suffer an adverse employment action. ACS contends that Hay "made the voluntary choice to decline to return to her full-time position" and instead "sought to return to work with abbreviated hours on specific days of the week." (Doc. No. 32 at 9.) It points out that, after ACS informed Hay that it would not grant her request for a shortened schedule, Hay was the party who brought up returning her equipment. (*Id.*) Second, it argues that, even if the court presumes that ACS terminated Hay, Hay cannot establish a causal connection between her FMLA leave and her termination, because "any purported termination would be due to Hay's refusal to accept ACS's reinstatement offer and return to full-time work following the expiration of her leave." (*Id.* at 10.) It also contends that its efforts to retain Hay negate any inference of causation that may be drawn from the temporal proximity at issue.

Hay argues in response that her termination was an adverse employment action and that the fact that "the adverse decision coincided with the end of Hay's protected leave," coupled with evidence of ACS's animus against her, is sufficient to permit a jury to infer a causal connection. (Doc. No. 43 at 18.) For instance, she points to an email exchange among Stephanie Hall, Ginger

Hearn, and Matt Ingram on May 2, 2023, in which Ingram asked Hearn for input on the situation, because "Jennifer [McClure] and Patti [Hearn] are both saying that they are unable to accommodate [Hay's] request" for short shifts and PRN "for the next 3 to 6 months," "due to being overstaffed for AM shifts. However, they have allowed other employees to go PRN for various reasons." (Doc. No. 41-7 at 73–74.) Hearn asked for input from Hall, and Hall responded:

> [Hay] has exhausted FMLA and because she needs intermittent leave, a PLOA would not be beneficial. So the issue is that she has requested to go PT or PRN. I think this is where we could potentially be at risk. They are not consistent with how they allow employees to go from FT to PRN or PT. We have tried to get them to set forth a standard set of questions to determine if someone can go PRN or PT, but they are not consistent with how they apply this.
>
> Jennifer and Patti do not want this employee. Therefore they are going to resist and potentially go to you (or higher) to argue this. . . .

(*Id.* at 73.)

Hay, too, points out that other employees were permitted to transition from full-time to PRN, and she asserts that ACS's "oscillati[on]" between characterizing her termination as a "resignation" and a "failure to return" "suppl[ies] further proof from which a jury may infer retaliatory causation and pretext." (Doc. No. 43 at 18 (citing *Cooley v. E. Tenn. Human Res. Agency, Inc.*, 720 F. App'x 734, 745 (6th Cir. 2002)).)

ACS's Reply reiterates its position that the plaintiff's refusal to return to full-time work cannot be characterized as an adverse employment action on the part of ACS and that the refusal of reinstatement breaks any causal chain. (*See* Doc. No. 48 at 8 ("An FMLA retaliation claim requires that some sort of adverse action follow FMLA leave. Here, ACS did the opposite: it offered Hay her original job after her FMLA leave expired.").) It also maintains that the fact that it offered reinstatement negates the inference of any retaliatory intent. (*Id.* at 9.)

As set forth above, to establish a *prima facie* retaliation case, the plaintiff must show that, "after learning of the employee's exercise of FMLA rights, the employer took an employment

action adverse to her." *Killian*, 454 F.3d at 556. Here, the defendant claims that it offered the plaintiff restoration to her original position and that, when she refused it and discussed returning her equipment, ACS reasonably understood her to have resigned. However, there is documentation in the record suggesting that ACS *terminated* Hay based on her refusal to return to work full-time following leave. There is also evidence that Hay wanted and intended all along to return to work, that she had been assured, at least initially, that a part-time or PRN position would be available to her, and that she was blindsided by ACS's sudden reversal of position, telling her that she could only come back to work full-time, working twelve-hour shifts. The court finds the evidence in the record sufficient to support an inference that the plaintiff was terminated. Hay herself construed ACS's position as equivalent to "firing" her. (Hay Dep. 161–62, 165.) In other words, in this context, there is a material factual dispute as to whether the plaintiff resigned or was terminated and therefore subject to an adverse employment action. Moreover, even her resignation could, under the circumstances, be deemed a constructive discharge.

ACS also argues that the plaintiff cannot establish a causal connection between her FMLA leave and her termination, essentially because the length of time between Hay's taking FMLA leave and the adverse action does not, standing alone, give rise to an inference of causation, and, in any event, "Hay's refusal of the reinstatement offer . . . severs any purported causal chain, regardless of temporal proximity." (Doc. No. 48 at 8.)

While the Sixth Circuit has equivocated on this issue, it has indicated that, on rare occasions, acutely close temporal proximity may, standing alone, be sufficient to establish causation at the *prima facie* stage. *See, e.g.*, *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 449 (6th Cir. 2020) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008)). The Sixth Circuit has also been less than clear about when the clock begins running for purposes of a

retaliation claim. *Compare, e.g.*, *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 452 (6th Cir. 2017) ("[T]he relevant timeframe for us to consider in determining whether there was a causal connection between the plaintiff's FMLA leave and the adverse employment action is the 'time after an employer learns of a protected activity,' not the time after the plaintiff's FMLA leave expires." (quoting *Mickey*, 516 F.3d at 525), *with Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 410 (6th Cir. 2014) ("[W]e have measured temporal proximity from the date FMLA leave expired, not just when the employee first requested it, for the purposes of measuring temporal proximity").

The relevant time in this case is the time between the plaintiff's termination and her anticipated return to work, which was a matter of a couple of weeks. The court finds that the temporal proximity between the termination of the plaintiff's FMLA eligibility and the termination of her employment, coupled with other circumstantial evidence in the record, is sufficient to give rise to an inference of causality, for purposes of the plaintiff's *prima facie* case. In particular, there is evidence that, even before Hay was offered restoration to her full-time position, ACS's management "did not want" Hay, as set forth in the HR emails that Hay highlights. In addition, although the FMLA does not grant her "an independent right to be considered for a transfer" to a PRN or part-time position, "the FMLA does protect [Hay's] right to be treated the same as other similarly situated employees." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001). Hay has offered evidence suggesting that other employees were permitted to transition from full-time to part-time or PRN, but, when she indicated that she wanted to work PRN, she was told that that was not an option.

Further, although ACS claims that working twelve-hour shifts was a requirement for working either part-time or PRN, there is no evidence that it explained that policy to the plaintiff

or that it was actually an essential job requirement. The plaintiff, moreover, repeatedly stressed her flexibility, and she testified that, once she understood that the choice was between working twelve-hour shifts and not working at all, she attempted to inform ACS that she could make twelve-hour shifts work, just not three shifts per week. (Hay Dep. 162.)

Under these circumstances, particularly given ACS's abrupt about-face (at least from the plaintiff's perspective) as to whether it would grant the plaintiff a flexible schedule for some period of time upon her return to work, the court finds that a reasonable jury could infer a causal connection between the plaintiff's taking FMLA leave and her termination. Thus, for purposes of summary judgment, the plaintiff has established a *prima facie* case of retaliation. The defendant does not discuss the next steps of the *McDonnell Douglas* burden-shifting framework— specifically whether Hay can rebut its proffered reasons[9] for its actions. The court declines to address an argument the defendant did not make and concludes instead that the defendant is not entitled to summary judgment on the plaintiff's FMLA retaliation claim.

### 3. *Title VII and PDA Claims*

In her Complaint, Hay asserts that ACS violated Title VII and the PDA when it discriminated against her "due to her sex and pregnancy," failed to accommodate a pregnancy-related need,[10] and retaliated against her for "oppos[ing] discrimination based on her sex and pregnancy." (Compl. ¶¶ 50–52.)

---

[9] ACS does not characterize it as such in the context of the plaintiff's FLMA retaliation claim, but the court presumes that it would argue that the plaintiff's refusal to return to work full-time provided it a legitimate, non-retaliatory reason for considering her to have resigned. But ACS does not address its failure to engage with the plaintiff more directly about her request for short shifts or its failure to consider allowing her to transfer to a part-time or PRN position.

[10] In fact, the Complaint raises a claim for failure to accommodate under the TPWFA (Doc. No. 1 ¶¶ 59–72), not Title VII (*see id.* ¶¶ 47–56). ACS did not address a Title VII/PDA failure to accommodate claim in its summary judgment Memorandum. Hay's Response to the Motion for Summary Judgment asserts that she has made a claim for failure to accommodate under Title VII

a)      *Discrimination*

Legal Framework

Title VII makes it unlawful for a covered employer to "discriminate against any individual with respect to . . . [the] terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e–2(a)(1). The PDA, enacted in 1978, requires employers to treat "women affected by pregnancy, childbirth, or related medical conditions . . . the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work." 42 U.S.C. § 2000e(k). The PDA, that is, "makes clear that Title VII's prohibition against sex discrimination applies to discrimination based on pregnancy." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 210 (2015). In addition, "the [PDA] makes clear that its protection extends to the *whole range of matters concerning the childbearing process*." *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 469 (6th Cir. 2005) (citation omitted) (emphasis in original).

A plaintiff can prove disparate treatment for purposes of Title VII and PDA claims through either "direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic" or indirect evidence, using the burden-shifting framework set forth in *McDonnell Douglas*. *Id.* at 213 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Using indirect evidence, the plaintiff must first establish a *prima facie* case of pregnancy discrimination by showing that "(1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Latowski v. Northwoods Nursing Ctr.*, 549 F. App'x 478, 483 (6th Cir.

---

as well as state law. (Doc. No. 43 at 13.) The defendant addresses this claim in its Reply. (Doc. No. 48 at 11.)

2013) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000)). A plaintiff can satisfy the fourth element "through comparison to 'another employee who is similarly situated in her or his ability or inability to work [and] received more favorable benefits.'" *Id.* (quoting *Ensley–Gaines v. Runyon*, 100 F.3d 1220, 1226 (6th Cir. 1996)).[11]

If the plaintiff succeeds in establishing a *prima facie* case with indirect evidence, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for its adverse employment decision. *Asmo v. Keane, Inc.*, 471 F.3d 588, 592 (6th Cir. 2006). If the employer is able to do so, the burden shifts back to the employee, who, in order to defeat a motion for summary judgment, must show that the employer's articulated reason was a pretext for intentional discrimination. *Id.*

A plaintiff may also prove a PDA claim if she presents "direct evidence that, in treating a plaintiff adversely, the defendant was motivated by discriminatory animus." *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 469 (6th Cir. 2005) (citing *Ensley-Gaines*, 100 F.3d at 1224). "Discrimination 'because of sex,' under the PDA, must be 'because of or on the basis of pregnancy, childbirth, or related medical conditions.'" *Id.* (quoting 42 U.S.C. § 2000e(k)). "Direct evidence is evidence that proves the existence of a fact without requiring any inferences." *Rowan v. Lockheed Martin Energy Sys., Inc.*, 360 F.3d 544, 548 (6th Cir. 2004). Thus, "direct evidence is that evidence which, if believed, requires a conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Kocak*, 400 F.3d at 470 (quoting *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)). If a plaintiff proffers

---

[11] "While Title VII generally requires that a plaintiff demonstrate that the employee who received more favorable treatment be similarly situated 'in all respects,'" the PDA requires only that the non-pregnant comparator employee be similar in his or her "ability or inability to work." *Ensley-Gaines*, 100 F.3d at 1226 (first quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); then quoting 42 U.S.C. § 2000e(k)).

direct evidence of discrimination, "the burden of persuasion shifts to the defendant to show that it would have [taken the adverse employment action] had it not been motivated by discrimination." *Id.*

The Parties' Arguments

In support of its Motion for Summary Judgment, ACS presumes that Hay intends to rely on indirect evidence of pregnancy discrimination. It argues, first, that she cannot establish a *prima facie* case of pregnancy discrimination because (1) she voluntarily resigned, which is not an adverse employment action; (2) even if she is considered to have been terminated, the termination was because of her refusal to return to work full-time following FMLA leave and "ACS's corollary inability to create a specific, shortened schedule for Hay based on her childcare needs"; (3) Hay cannot show that any similarly situated, non-pregnant employees asked for or received "the type of special schedule Hay requested"; and (4) the length of time between Hay's announcement of her pregnancy (July 14, 2022) and the termination of her employment (May 4, 2023) is not sufficiently short, standing alone, to give rise to an inference of causality. (Doc. No. 32 at 11–14.)

Second, ACS argues that, even assuming that the plaintiff can establish a *prima facie* case of pregnancy discrimination, she cannot show that ACS's non-discriminatory reason for separating her from her employment—her unequivocal refusal to return to her full-time Transfer Coordinator position, working three twelve-hour shifts per week—is pretext for discrimination. (*Id.* at 13–14.) More specifically, it argues that the plaintiff cannot show that ACS did not reasonably and honestly believe that the plaintiff resigned on May 4, 2023 when she asked how to return her equipment and hung up on Hall, as established by all of its subsequent communications with her.

The plaintiff responds by arguing that she has direct evidence of pregnancy discrimination. Specifically, she claims that, when she was removed from her charge nurse duties while she was

pregnant, she was "explicitly told that pregnancy was the reason." (Doc. No. 43 at 11 (citing Hay Dep. 61; ACS 000113).) Hay asserts that the defendant has not addressed this claim and therefore is not entitled to summary judgment.

In addition, she argues that she was subjected to pregnancy discrimination when she "was not allowed to change her schedule for pregnancy-related reasons," while other employees were allowed to change their schedules and to transition to PRN and part-time schedules for non-pregnancy-related reasons. (*Id.* at 12.) She points out that ACS itself contends that, because the request was related to "personal childcare needs (rather than a medical need), ACS did not offer Hay the hours for which she was asking." (*Id.* (citing ACS SUMF ¶¶ 48, 37).) Hay insists that this shows that ACS treated her different "because of the pregnancy- and motherhood-related reason for her request." (*Id.*)

Hay also denies asking for a "special schedule" and characterizes her request as simply a request to move to part-time or PRN. She contends that ACS asked her for her preferred availability and that, in response, she sent in her preferred schedule but always qualified it by emphasizing that she could be flexible. ACS, however, never explained to her that it would not accommodate a reduced-shift schedule and never offered her the opportunity to move to part-time or PRN work, despite the availability of such positions. She also points out that her May 3 email does not appear to be the catalyst for the decision not to allow her to work part-time. Rather, the evidence makes it clear that the decisionmakers had already decided by May 1 that they would not accommodate her request for a modified schedule, citing McClure's May 1, 2023 email stating that partial morning shifts were not available and that she was "not interested in creating exceptions for a staffing need I do not have," in response to emails from Galbreath, explaining that the plaintiff wanted "reduced hours due to her new baby," wanted to work three six-hour shifts per week, and

was available only in the morning. (Doc. No. 41-7 at 75, 74.) The plaintiff asserts that the evidence is "easily" sufficient to show that ACS discriminated against her based on sex, pregnancy, and motherhood. (Doc. No 43 at 13.)

ACS replies that the plaintiff's claim that she was discriminatorily removed from charge nurse duties because of her pregnancy is not alleged in the Complaint, was not exhausted in the plaintiff's EEOC charge or amended charge, and in any event is not supported by direct evidence. (Doc. No. 48 at 10.) As for the plaintiff's scheduling-related discrimination claim, ACS maintains that the plaintiff lacks direct evidence, as ACS's denial of a schedule tailored to the plaintiff's "personal childcare needs" is not direct evidence of sex or pregnancy discrimination. (*Id.*) The plaintiff filed a Surreply, arguing that all of her claims are fully exhausted and that "what [she] actually requested . . . was a modified schedule for *two months* for her breastfeeding and recovery," not merely "childcare," and that no one at ACS ever asked her why she wanted a modified schedule. (Doc. No. 55 at 10 (citing Hay Dep. 129–30, 136, 139, 146, 156–57).) In addition, however, she argues that the court should consider circumstantial evidence.

<u>Discussion</u>

First, regarding the plaintiff's discrimination claim based on her having been removed from charge nurse duties because of her pregnancy, the court finds that this is an entirely new claim that is not pleaded in the Complaint. The Complaint focuses exclusively on the defendant's alleged unwillingness to provide FMLA leave, refusal to allow Hay to return to work part-time or PRN, and refusal to reinstate her to her former position or an equivalent position when her FMLA leave terminated. (*See generally* Doc. No. 1.) Although Hay asserts pregnancy discrimination claims under various statutory schemes, she does not allege facts—or assert claims based on facts—

showing that she was treated differently or suffered an adverse employment action prior to taking FMLA leave because of her pregnancy.

It is well settled in the Sixth Circuit that a "plaintiff may not expand [her] claims to assert new theories in response to summary judgment." *Renner v. Ford Motor Co.*, 516 F. App'x 498, 504 (6th Cir. 2013) (citing *Bridgeport Music, Inc. v. WB Music Corp.*, 508 F.3d 394, 400 (6th Cir. 2007)). Instead, "[a]t the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Rule 15(a)." *Id.* (quoting *Tucker v. Union of Needletrades*, 407 F.3d 784, 788 (6th Cir. 2005)). The Sixth Circuit has regularly declined to consider claims articulated for the first time in response to summary judgment or on appeal. *Accord, e.g.*, *Dibrell v. Rex*, No. 25-5334, 2025 WL 3285587, at *7 (6th Cir. Nov. 25, 2025) (affirming summary judgment on the defendant's malicious prosecution claim based on allegations that the plaintiff had knowingly made false statements to the grand jury and declining to consider the plaintiff's "alternative" "continued-prosecution" theory of malicious prosecution raised for the first time in his opposition to the defendant's motion for summary judgment); *Vonderhaar v. Waymire*, 797 F. App'x 981, 990–91 (6th Cir. 2020) (declining to consider the plaintiff's new FMLA-interference theories, not alleged in the pleading but argued in response to summary judgment).

Although Hay testified about her then-supervisor's decision to take her off charge nurse duties during her May 2025 deposition, Hay did not seek to amend her pleading to allege this claim after her deposition. Asserting the claim for the first time in response to the Motion for Summary Judgment constitutes the type of "unfair surprise" the rule was designed to prevent. *Vonderhaar*, 797 F. App'x at 990. The court therefore declines to consider this claim on summary judgment or

to deem the Complaint amended to assert it.[12]

The issue then is whether ACS's treatment of the plaintiff's request to work a reduced schedule constitutes discrimination in violation of the PDA. The plaintiff, as set forth above, insists that she has presented direct evidence of discrimination. The court finds, however, that she has not presented direct evidence of discrimination based on sex or pregnancy. All of the evidence to which the plaintiff refers concerns the denial of what the ACS decision-makers perceived as a request for a reduced schedule based on Hay's own and her new family's scheduling issues. The plaintiff points to no direct evidence that proves, without the need to draw inferences, that ACS's ultimate denial of her request was based on her sex or pregnancy.

For instance, Hay's pointing to ACS's "admission" that it denied her request because it was "based on personal childcare needs (rather than a medical need)" (*see* ACS SUMF ¶ 37) does not support her claim. Although the Sixth Circuit does not appear to have directly addressed this issue, Judge Todd Campbell of this court has held that discrimination based on parenthood and childcare needs does not violate Title VII, because there is nothing inherently gendered about childcare. *See Mayberry v. Endocrinology-Diabetes Assocs.*, 926 F. Supp. 1315, 1326 n.13 (M.D. Tenn. May 31, 1996) (Campbell, J.) ("[Plaintiff's] need for different work hours has to do with being a parent, not with being pregnant, and parents are not a protected class under Title VII."). And other federal appellate and district courts outside the Sixth Circuit have consistently held that, absent some contextual support for an inference of gender discrimination, discrimination based on parental status and childcare needs does not implicate Title VII or the PDA. *See, e.g.*, *Seibert v. Lutron Elecs.*, 408 F. App'x 605, 608 n.1 (3d Cir. 2010) (noting that the plaintiff's claim raised in

---

[12] That a defendant had notice that the plaintiff may have been in possession of facts to support this new theory of discrimination is not the same as being on notice that the plaintiff intended to assert the claim.

response to summary judgment that she was subjected to an adverse employment action when she was "singled out and forced to use her vacation time simply because she was having post natal problems with her twins," even if it had been timely, lacked merit because "post-natal childcare duties are not within the protections afforded by the PDA"); *Adamson v. Multi Cmty. Diversified Servs., Inc.*, 514 F.3d 1136, 1148 (10th Cir. 2008) ("Title VII protects neither the family unit nor individual family members from discrimination based on their 'familial status' alone."); *Piantanida v. Wyman Ctr., Inc.*, 116 F.3d 340, 340 (8th Cir. 1997) (affirming dismissal of PDA claim premised on allegations that the plaintiff was demoted "because she was a 'new mom,'" because the "claim for discrimination based on her status as a new parent fell outside the parameters of the PDA"); *see also Dryden v. Graves*, 785 F. Supp. 3d 563, 571 (D.S.D. 2025) ("Dryden's claims stem from the DOE's characterization of her as a 'new mom.' . . . The Eighth Circuit, however, has held that 'claim[s] of discrimination based on [an employee's] status as a new parent [are] not cognizable under the PDA.'" (citing *Piantanida*, 116 F.3d at 342)); *Guglietta v. Meredith Corp.*, 301 F. Supp. 2d 209, 213–14 (D. Conn. 2004) ("Although Plaintiff seemingly contends that her status is that of a 'woman with a child,' her actual claim appears to be that of a 'woman with childcare difficulties.' . . . This Court . . . holds that child-rearing is not a sex-plus characteristic protected by Title VII, the Pregnancy Disability Act, or any other federal or state antidiscrimination statute." (collecting cases)); *Pearlstein v. Staten Island Univ. Hosp.*, 886 F. Supp. 260, 266 n.5 (E.D.N.Y. 1995) ("Title VII, as amended by the [PDA], 'does not protect people wishing to take child-rearing leaves as opposed to women seeking pregnancy leaves.'" (quoting *Record v. Mill Neck Manor Lutheran Sch. for the Deaf*, 611 F. Supp. 905, 907 (E.D.N.Y. 1985))); *Payseur v. W.W. Grainger, Inc.*, No. 88 C 5707, 1989 WL 152583, at *1 (N.D. Ill. Nov. 28, 1989) ("The PDA prohibits employment-related discrimination 'on the basis of pregnancy,

childbirth, or related medical conditions.' The desire to take care of one's child, however, is plainly not a medical condition related to pregnancy or childbirth and is thus not protected by the PDA.").

The only explanation the court can find in the record that the plaintiff gave ACS for needing a reduced schedule was her need to "balance family and work life," as set forth in her May 3, 2023 email (Doc. No. 31-2 at 120), a need to accommodate her child's feeding schedule (Hay Dep. 136), and a desire to work hours that would "work around [her] and [her] husband's schedule to take care of [their] baby (*id.* at 133). A baby's feeding schedule is not a "medical condition" related to childbirth. Thus, the sole fact that Hay was denied a request for a modified schedule following a return to work after maternity leave, standing alone, is not evidence from which a reasonable jury could conclude, without more, that Hay was discriminated against on the basis of some "distinction[] based upon 'pregnancy, childbirth, or related medical conditions.'" *Grant v. Gen. Motors Corp.*, 908 F.2d 1303, 1307 (6th Cir. 1990) (quoting 42 U.S.C. § 2000e(k)).

Faced with this argument in the defendant's Reply brief, the plaintiff changes tack, asserting in her Surreply that she did not need additional leave or a modified schedule because of childcare needs. Instead, "what [she] actually requested . . . was a modified schedule for *two months* for her breastfeeding and recovery." (Doc. No. 55 at 10.) However, although Hay alluded to post-partum medical issues and difficulties breastfeeding in her deposition, there is no evidence whatsoever that she contemporaneously communicated to anyone at ACS that she was medically (whether physically or psychologically) unable to return to work full-time following expiration of her FMLA leave. The Sixth Circuit has noted that an employer's denial of additional leave to an employee who claimed that she needed the additional leave to breastfeed, because her baby refused bottles, did not implicate the PDA, because the plaintiff "failed to produce evidence supporting her contention that breastfeeding her child was a medical necessity." *Wallace v. Pyro Min. Co.*,

951 F.2d 351 (Table), 1991 WL 270823, at *1 (6th Cir. Dec. 19, 1991). It is clear from the record in this case that ACS understood the plaintiff to be saying that she wanted more time at home with her baby and did not want to work twelve-hour shifts. Denial of her request does not constitute direct—or even indirect—evidence of discrimination in violation of the PDA (or Title VII generally), absent evidence that the plaintiff requested a modified schedule based on some pregnancy- or childbirth-related *medical* need, as opposed to a *scheduling* need.

The plaintiff also argues, in her Surreply, that the court should consider circumstantial evidence and apply the *McDonnell Douglas* burden-shifting framework to her PDA discrimination claim. (Doc. No. 55 at 15.) Aside from the fact that the defendant had no opportunity to respond to the plaintiff's Surreply, the court finds that the plaintiff cannot establish a causal connection between her pregnancy or sex and her termination because, as discussed above, she cannot show that the defendant had any reason to know that the plaintiff's request for a modified schedule was related to a pregnancy- or childbirth-related medical need as opposed to a mere scheduling need (or the simple desire to stay home more with her young child). Moreover, the length of time between the plaintiff's announcement of her pregnancy (July 2022) and her termination (May 2023) is not sufficient to give rise to an inference of causation.

### b) Title VII/PDA Failure to Accommodate

The plaintiff also asserts that she has made out a failure-to-accommodate claim under Title VII and the PDA. In support of this claim, she asserts that she requested to "change her schedule based on pregnancy, motherhood, and pregnancy-related conditions," but she was not accommodated, even though ACS had part-time shifts available. (Doc. No. 43 at 14.) This claim, obviously, is closely related to her PDA discrimination claim.

The second clause of the PDA provides that pregnant employees "shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability

or inability to work." 42 U.S.C. § 2000e(k). Courts construe this clause to mean that pregnant employees must be accommodated in cases where other employees would be given similar accommodations for reasons other than pregnancy. *Young*, 575 U.S. at 229. As the Supreme Court has explained:

> [A] plaintiff alleging that the denial of an accommodation constituted disparate treatment under the Pregnancy Discrimination Act's second clause may make out a *prima facie* case by showing, as in *McDonnell Douglas*, that she belongs to the protected class, that she sought accommodation, that the employer did not accommodate her, and that the employer did accommodate others similar in their ability or inability to work.

*Id.* at 229. The PDA applies to all those "affected by pregnancy, childbirth or related medical conditions." *Tysinger v. Police Dep't*, 463 F.3d 569, 572 (6th Cir. 2006). However, it appears that most cases addressing claims of failure to accommodate under the PDA involve plaintiffs who were actually pregnant at the time they requested an accommodation. *See, e.g.*, *Young*, 575 U.S. at 211; *Tysinger*, 463 F.3d at 571; *Adduci v. Fed. Express Corp.*, 298 F. Supp. 3d 1153, 1156 (W.D. Tenn. 2018).

The plaintiff in this case was not pregnant at the time she requested an accommodation. She had given birth approximately three months previously, but she did not indicate to ACS—and has not presented evidence showing—that she had any kind of pregnancy- or lactation-related medical condition that warranted an accommodation. The plaintiff's assertions in her deposition that her request for leave was related to lactation are not sufficient to establish that she had a *medical* condition related to lactation. That is, for purposes of her *prima facie* case, the plaintiff has not established that she belongs to the class of individuals protected by the PDA.

And even if the plaintiff's belated assertions alone were sufficient to establish that she was protected by the PDA (that she was "suffering both complications from childbirth and breastfeeding" (Doc. No. 43 at 14–15)), there is no evidence that she told anyone at ACS that she

was suffering from any such complications or needed any kind of pregnancy- or lactation-related accommodation. The plaintiff asserts that an employee is "not required to volunteer medical facts in requesting an accommodation." (*Id.* at 15 n. 7 (citing 29 C.F.R. § 1636.3(h)(2), (l)(1)).) Aside from the fact that the regulations the plaintiff cites were implemented in connection with the Pregnant Workers Fairness Act ("PWFA"), 42 U.S.C. § 2000gg, not the PDA, these regulations pertain to reasonable accommodations for "an employee . . . with a known limitation under the PWFA," but they also require the employee to "communicate that the employee needs an adjustment or change at work due to [her] limitation (a physical or mental condition relate to affected by, or arising out of pregnancy, childbirth, or related medical condition." 29 C.F.R. § 1636.3(h)(1), (2). Here, the plaintiff never communicated such a need. Moreover, subsection (l)(1) of the same regulation says only that the "covered entity is not required to seek supporting documentation," but it "may" do so. *Id.* § 1363.3(l)(1). In any event, the employee requesting an accommodation must, at a minimum, explain why she needs an accommodation. Hay, however, never communicated a mental or physical condition related to or affected by pregnancy, childbirth, or a related medical condition. As a result, she did not request an accommodation *under the PDA*.

Moreover, as ACS argues, the plaintiff argues very broadly that other employees were permitted to work short shifts, but she has not rebutted ACS's evidence that no other employees were regularly scheduled to work short shifts. Rather, as discussed above, *see supra* at 5, employees like Amy Maddox, to whom the plaintiff points as a comparator, worked occasional short shifts in overtime, pursuant to the employer's need, in addition to the three twelve-hour shifts she was regularly scheduled to work. Hay has not pointed to any employees who requested and were granted leave, for any reason, to regularly work less than twelve hours per shift on the regular weekly schedule. That is, she has not shown that ACS accommodated other employees similar in

their ability or inability to work by allowing them to work regularly scheduled short shifts.

The plaintiff cannot establish a failure to accommodate in violation of the PDA.

c)    Retaliation

In her Complaint, Hay asserts that ACS violated Title VII and the PDA when it retaliated against her for opposing discrimination and requesting an accommodation under the PDA. (Doc. No. 1 ¶¶ 44, 48.)

The parties presume, as does the court, that PDA retaliation claims, like other Title VII claims, are analyzed under the *McDonnell Douglas* rubric. To state a *prima facie* case of PDA retaliation then, the plaintiff must establish that (1) she engaged in activity protected by the PDA; (2) defendant was aware that Hay had engaged in protected activity; (3) after she engaged in protected activity, ACS took an adverse employment action against her; and (4) "there was a causal connection between the protected activity and the adverse employment action." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 649 (6th Cir. 2015) (quoting *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009)). Only if the plaintiff produces evidence sufficient to support each element of the *prima facie* case does the burden shift to the defendant to proffer a legitimate, non-retaliatory reason for its actions. *Id.* at 650.

The plaintiff asserts that she engaged in activity protected by the PDA when she complained about pregnancy discrimination to Hall, in the same telephone call in which Hall told Hay that she could only come back to work full-time, working three twelve-hour shifts per week. Regarding that complaint, the plaintiff testified that she felt that she was not being treated like a human being and was being discriminated against as a "new mother." (Hay Dep. 160–61, 165, 168.) The defendant argues that a complaint about discrimination at the time of the adverse action cannot support a retaliation claim. Accordingly, the defendant argues, the plaintiff has failed to identify any protected activity. It further argues that, even if she did engage in protected activity,

she cannot dispute the defendant's proffered legitimate reason for its action: that she refused the offer of reinstatement to her former position.

In her Response, the plaintiff contends that the less than one day between her complaint to Hall and the emails the next day confirming the defendant's position that she had resigned the day before establishes a causal connection. Hay further argues that the defendant does not address her retaliation claim premised on her "requesting, using, or needing a reasonable accommodation under Title VII." (Doc. No. 43 at 17; *see also id.* at 19.) She asserts that she has shown a material factual dispute as to whether the defendant's proffered reason for its action is retaliatory.

ACS replies that the plaintiff did not allege in her Complaint a retaliation claim premised upon requesting a reasonable accommodation, as a result of which ACS was not required to address any such claim in its summary judgment filing. (Doc. No. 48 at 18.) It argues that temporal proximity in this case is irrelevant where the supposed adverse action predated the purported protected activity and that, in any event, the plaintiff cannot rebut its proffered reason for its action.

The court finds that: (1) complaining about being discriminated against as a "new mother" is not activity protected by the PDA; and (2) even if it were, the fact that the plaintiff voiced this complaint *after* Hall told her that ACS "only had three 12-hour shifts for [Hay] to work and that is the only way [she] could return" (Hay Dep. 161) means that the decision only to offer Hay restoration to her full-time job could not have been in retaliation for her complaint to Hall. Insofar as the plaintiff contends that the retaliatory actions came the next day, in the form of emails confirming that ACS considered her to have resigned, these emails simply documented ACS's understanding of what had occurred in the telephone call the previous day—including its interpretation of the plaintiff's refusal of the offer to return to work full-time, her discussion of returning her equipment, and her hanging up on Hall—as Hay's resignation. Regardless, the

adverse action about which the plaintiff has complained all along is that ACS did not allow her to return to work part-time or PRN. That decision was made and communicated to her before Hay complained about discrimination as a "new mother." The retaliation claim premised on that complaint therefore fails as a matter of law.

Regarding the plaintiff's claim that she was retaliated against for requesting an accommodation under the PDA, the court finds that the plaintiff did not allege this claim in her Complaint, and a Response in opposition to the summary judgment motion is not an appropriate means of pleading a new theory of recovery, as discussed above. Regardless, even if the Complaint could be broadly construed as asserting a retaliation claim based on the denial of a request for an accommodation, the plaintiff has not shown that she actually requested an accommodation protected by the PDA or that the defendant was aware that she was requesting an accommodation protected by the PDA.

That is, as discussed above, and as ACS argues (Doc. No. 48 at 16), Hay has not pointed to any evidence suggesting that she communicated a request for a pregnancy-related medical accommodation to ACS, as opposed to simply a request to accommodate her desire, as a new mother, to work fewer hours in order to spend more time caring for her daughter. All of the contemporaneous emails among ACS employees show that ACS had no reason to believe that Hay's request was medically based or otherwise related to her pregnancy. Jennifer McClure noted that Hay's request stemmed from "ha[ving] a newborn baby and . . . trying to navigate hers and her husband's schedules," adding that "it is a daycare issue per my understanding from Patty's conversation." (Doc. No. 31-4 at 29.). Similarly, Galbreath understood that Hay was "requesting reduced hours due to her new baby." (*Id.* at 25.) Ingram understood that Hay's availability and flexibility centered around her husband's work schedule. (Doc. No. 41-7 at 73–74.) In other words,

ACS understood Hay to be requesting an accommodation due to childcare scheduling issues. Thus, even if the denial of a request for an accommodation under the PDA could be deemed retaliatory (as opposed to simply discriminatory) the plaintiff has not shown that she engaged in activity protected by the PDA or that ACS knew that she had engaged in activity protected by the PDA. Her PDA retaliation claim fails as a matter of law.

### C. Conclusion – ACS's Motion for Summary Judgment

For the reasons set forth herein, ACS's motion will be denied with respect to the plaintiff's FMLA retaliation claim but granted with respect to the plaintiff's state law claims and her PDA/Title VII claims.

## IV. CHSI'S MOTION

Although CHSI adopts and incorporates by reference ACS's arguments in support of summary judgment, the primary thrust of its motion is that it is entitled to summary judgment on all claims against it because it was not the plaintiff's employer or joint employer. Rather, it is an indirect corporate parent of ACS and a publicly traded holding company with no employees. The plaintiff purports to dispute many patently undisputed facts and vigorously argues that there are material factual disputes that preclude dismissal of CHSI as a defendant on summary judgment. The plaintiff's position is contrary to law and an utter waste of the court's and the parties' time and resources, particularly given that there is simply no dispute that ACS was Hay's employer and no suggestion in the record of corporate impropriety or that ACS lacks sufficient resources to pay any judgment against it.

### A. Facts

At all relevant times, Katrina Hay was an employee of ACS. (*See* Doc. No. 15, ACS Answer ¶ 26 ("ACS admits that it hired Plaintiff in January 2021."); *see also* Doc. No. 34-4 at 13.)

Defendant Community Health Systems, Inc. ("CHSI") is a Delaware corporation with its principal place of business in Franklin, Tennessee. (Doc. No. 46, Baldwin Corr. Decl. ¶ 2.) CHSI is a "holding company that has no employees." (*Id.*) CHSI has indirect subsidiaries that own or lease 70 hospitals nationwide. (*Id.*) The only company of which it has a direct ownership is CHS/Community Health Systems, Inc., which "also is a holding company with no employees." (*Id.*)

CHSPSC, LLC ("CHSPSC") is an indirect subsidiary of CHSI. (*Id.* ¶ 14.)[13] CHSPSC is a separate legal entity that provides professional consulting services through contract to hospitals, clinics and other health care-related service entities affiliated with CHSI. (*Id.* § 15.) It also provides an intranet for employees of those entities to use, including employees of ACS. (*Id.*) CHSPSC employs and contracts with individuals. (*Id.*)

ACS's direct parent company is SS ParentCo., LLC. (Doc. No. 34-4, McClure Dep. 9.) According to the Organizational Structure Chart attached as an exhibit to Jennifer McClure's Rule 30(b)(6) Deposition transcript, the direct corporate parent of SS ParentCo., LLC is CHS/Community Health Systems, Inc., whose direct corporate parent is defendant Community Health Systems, Inc. (Doc. No. 34-4 at 9.) In other words, ACS is an "indirect, wholly owned subsidiary of [CHSI]," with CHSI being "three entities removed from direct ownership" of ACS. (Doc. No. 46, Baldwin Corr. Decl. ¶ 3.) CHSI does not operate, manage, or do business as ACS or any other entity or business. (*Id.*) It does not direct or control the day-to-day operations of ACS. (*Id.* ¶ 4.) It does not direct the actions of ACS employees and has not entered into any kind of joint

---

[13] The plaintiff purports to dispute this statement, asserting, that CHSPSC's immediate parent corporation is CHS/Community Health Systems, Inc., and that entity's "immediate parent corporation" is CHSI. (PRSUMF ¶ 7.) In other words, CHSI is CHSPSC's indirect corporate parent.

venture or partnership with ACS. (*Id.* ¶ 5.) ACS maintains its own banking and accounting records. (*Id.* ¶ 6.) CHSI's Board of Directors and ACS's Board of Directors share some members but are not identical. (*Id.* ¶ 7.) ACS has never been designated as an agent of, or authorized to act on behalf of, CHSI. (*Id.* ¶ 8.)

CHSI "did not employ or contract with Katrina Hay or any other individual who worked at [ACS]." (*Id.* ¶ 9.) CHSI does not "make or participate in any business, medical, or employment decisions or actions" undertaken by ACS, including those at issue in this case, and was not "involved in any decisions or actions relating to Katrina Hay or any other individual's employment or contractual relationship with [ACS]." (*Id.* ¶¶ 10, 12.)

"CHS" and "Community Health Systems" are "trade names." (*Id.* ¶ 13.) "[T]hey are not legal entities." (*Id.*) CHS/Community Health Systems, Inc., which is a direct subsidiary of CHSI but also a legal entity separate and distinct from CHSI, owns the trade names "CHS" and "Community Health Systems" and the CHS logo. (*Id.* ¶¶ 2, 13.) CHSPSC, through a licensing agreement with CHS/Community Health Systems, Inc., grants ACS a limited, non-exclusive license to use the CHS logo and trade names. (Doc No. 54-2, Baldwin Supp. Decl. ¶ 4.)

Many of the individuals involved in the employment decisions relating to Hay identified themselves as employed by CHSPSC while acting as agents or representatives of ACS, including Ginger Hearn, Stephanie Hall, Matt Ingram, and "other HR team members." (*See, e.g.*, Doc. No. 41-9, Hearn 30(b)(6) Dep. 136–37 (agreeing that Hearn, who was designated as a corporate representative of ACS, is employed by CHSPSC, considered herself as an "agent or representative that supports ACS" in her job as HR director, and that other CHSPSC employees engaged in HR roles for ACS were "agents or representatives of ACS, supporting [ACS] in the HR role"); Doc. No. 41-7, Hall Dep. 13 (identifying herself as Human Resources Manager for CHSPSC who, at

the relevant time, was engaged in supporting ACS); *see also* Doc. No. 41-6, McClure 30(b)(6) Dep. 16 (stating that ACS does not have its own HR department and that CHSPSC "does HR for ASC".) According to Russell Baldwin, Vice President and Chief Litigation Counsel for CHSPSC, CHSPSC provides "professional consulting services" to CHSI-affiliated entities, including ACS, through a Professional Services Agreement. (Doc. No. 54-2, Baldwin Supp. Decl. ¶ 3; Doc. No. 54-2 at 6, Professional Services Agreement.)

The other individuals involved in the employment decisions affecting Hay, including Jennifer McClure, Patricia Galbreath, and Trina Swift, all testified that they were employed by ACS. (*See* Doc. No. 41-5, McClure Indiv. Dep. 13; Doc. No. 41-5, Galbreath Indiv. Dep. 11; Doc. No. 41-10, Swift Dep. 7.)

The plaintiff purports to dispute CHSI's statement that it did not direct the actions of ACS's employees and that ACS was not an agent for CHSI, asserting that "ACS's officers and employees are directed by CHS," a term it does not define. (Doc. No. 52, Pl.'s Resp. to CHSI's SUMF ("PRSUMF") ¶ 10.) In support of her insistence that "ACS's officers are directed by CHS," Hay asserts that at least one of ACS's directors is "also an agent of CHS," that Jennifer McClure testified that she was the senior executive of ACS, that McClure testified that she reported directly to CHSPSC Executive Vice President of Operations and Development Kevin Stockton, that Stockton's "'Executive Retention Case Award' was filed as part of CHS's quarterly and Annual Report in 2024," and that that award was "included in CHS's Annual Report as an exhibit to 'Item 10. Directors, Executive Officers, and Corporate Governance.'" (*Id.*) Hay also points out that "CHS" has adopted a Code of Conduct that applies to all "directors, officers, employees, and consultants" of CHS-affiliated entities, which, the plaintiff claims, further establishes that "CHS"

"directs the actions of its affiliates and employees through this program and the Code of Conduct." (*Id.*)

CHSI points out that, as a publicly traded company, it and its subsidiaries are required to adopt a compliance program and code of conduct, and each affiliated entity adopts the Code of Conduct through its own board or managing member. (Baldwin Corr. Decl. ¶¶ 16–17.)

The plaintiff contends generally, without evidentiary support and, apparently, with scant knowledge of corporate law, that "CHS" "jointly and ultimately" employed "all individuals" who were deposed in this case and identified themselves as ACS employees, because "CHS" was the "ultimate parent company and beneficiary of their employment." (PRSUMF ¶ 23.)

**B.     Discussion**

All of the statutory schemes under which the plaintiff proceeds define the term "employer," and all of them require that the "employer" employ at least a certain minimum number of employees. *See, e.g.*, 42 U.S. §§ 2000e(b) (defining "employer," for purposes of Title VII and the PDA, as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person"); 29 U.S.C. § 2611 (defining "employer" for purposes of the FMLA as "any person engaged in commerce or in any industry or activity affecting commerce who employs 50 or more employees for each working day during each of 20 or more calendar workweeks in the current or preceding calendar year," including "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer" and the "successor in interest of an employer").

"Entities that do not otherwise meet the definition of employer (either because they do not formally employ the plaintiff or do not meet the numerosity requirement) may still face liability through the single-employer or joint-employer doctrines." *Sanford v. Main St. Baptist Church*

*Manor, Inc.*, 449 F. App'x 488, 491 (6th Cir. 2011) (citation omitted). In addition, if a "person or entity that took the allegedly illegal employment action was acting as the agent of another company," that other company "may then be held liable as the plaintiff['s] employer." *Passmore v. Mapco Express, Inc.*, 447 F. Supp. 3d 654, 663 (M.D. Tenn. 2017) (quoting *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990, 993 (6th Cir. 1997)).

The plaintiff here, without actually conceding that CHSI was not her direct employer and did not itself employ any employees, maintains that CHSI is nonetheless liable under at least one of these three theories. (See generally Doc. No. 51.) She also argues that the court cannot simply take CHSI's corporate representative's word for it that CHSI did not employ Hay and that CHSI must instead "put forward undisputed and material facts that prove no jury would find [it] liable." (Doc. No. 51 at 10.)

On these latter points, the plaintiff is simply incorrect. Russell Baldwin, as Vice President and Chief Legal Counsel for CHSPSC, is competent and qualified to testify generally regarding CHSI's legal structure and specifically that CHSI did not employ Katrina Hay or anyone else. (*See* Baldwin Corr. Decl. ¶¶ 2–3, 9.) Moreover, the *plaintiff* bears the burden of proving that CHSI was her employer, which means she is required to produce actual evidence that calls Baldwin's testimony into question. That is, in response to a motion for summary judgment arguing, essentially, that there is no evidence establishing that CHSI is the plaintiff's employer, the plaintiff must put forward evidence creating a material factual dispute as to whether CHSI was her employer. *Passmore*, 447 F. Supp. 3d at 664 (citing *Tipton v. Northrup Grumman Corp.*, 242 F. App'x 187, 190 (5th Cir. 2007); *Sanford* 449 F. App'x at 495)).

### 1. Single-Employer Doctrine

"It is well established that a parent corporation and a subsidiary are in law separate and distinct entities." *Tenn. Valley Auth. v. Exxon Nuclear Co.*, 753 F.2d 493, 497 (6th Cir. 1985).

However, under the "single-employer" or "integrated enterprise" doctrine, "two companies may be considered so interrelated that they constitute a single employer subject to liability" for employment discrimination. *Passmore*, 447 F. Supp. 3d at 662 (quoting *Swallows*, 128 F.3d at 993). Courts consider the following four factors in determining whether two companies should be deemed a single employer: "(1) common ownership, (2) common management, (3) centralized control of labor relations, and (4) interrelation of operations." *N.L.R.B. v. Palmer Donavin Mfg. Co.*, 369 F.3d 954, 957 (6th Cir. 2004) (citing *Swallows*, 128 F.3d at 993–94). "The presence or absence of any of these factors is not conclusive, but 'control over labor relations is a central concern.'" *Sanford*, 449 F. App'x at 494 (quoting *Swallows*, 128 F.3d at 994). Thus, where a corporate parent and subsidiary are alleged to be a single employer, the "integrated enterprise" analysis "ultimately focuses upon whether the parent corporation was the final decision-maker with regard to the employment issue underlying the litigation." *Takacs v. Hahn Auto. Corp.*, No. C-3-95-404, 1999 WL 33117265, at *4 (S.D. Ohio Jan. 4, 1999) (citing *Swallows*, 128 F.3d at 995 (6th Cir. 1997)); *see also Passmore*, 447 F. Supp. 3d at 665 (same); *Smith v. The Cheesecake Factory Restaurants, Inc.*, No. 3:06-00829, 2010 WL 441562, at *11–12 (M.D. Tenn. Feb. 4, 2010) (Haynes, J.) (same).

In this case, the plaintiff presents some evidence that ACS and CHSI, as its corporate grandparent, share common ownership and share some common corporate officers. What the plaintiff cannot dispute, however hard she tries, is that CHSI has no employees and that ACS employees, assisted by HR personnel employed by CHSPSC but acting as agents for ACS,[14] made all of the personnel decisions at issue in this case. The court finds this factor to be determinative

---

[14] Notably, CHSPSC is not named as a defendant in this lawsuit. Even if it had been, it is clear from the evidence in the record that CHSPSC's HR personnel acted as agents for ACS, not the other way around. ACS did not act as an agent of CHSPSC.

and, therefore, that ACS and CHSI did not act as a single employer. The plaintiff's attempts to obfuscate the distinctions between the various entities at issue here—particularly by using the trade name "CHS" to refer interchangeably to CHSI, CHSPSC, and other CHS-affiliated entities—and to create a factual dispute on that point are unavailing.

### 2. *Joint Employer Doctrine*

The joint-employer doctrine applies when the plaintiff establishes that "a business that maintains sufficient control over some or all of the formal employees of another business as to qualify as those employees' employer." *Sanford*, 449 F. App'x at 491. Generally, "[w]hether a joint employer relationship exists depends upon 'such factors as the supervision of the employees' day to day activities, authority to hire or fire employees, promulgation of work rules and conditions of employment, work assignments, [and] issuance of operating instructions.'" *N.L.R.B. v. Centra, Inc.*, 954 F.2d 366, 370 n.2 (6th Cir. 1992) (quoting *W.W. Grainger, Inc. v. NLRB*, 860 F.2d 244, 247 (7th Cir. 1988)). Similarly, courts have found joint employer status to exist when "two or more employers exert significant control over the same employees—where from the evidence it can be shown that they share or co-determine those matters governing essential terms and conditions of employment." *Carrier Corp. v. N.L.R.B.*, 768 F.2d 778, 782 (6th Cir. 1985). The primary factors to be considered are "an entity's ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance." *E.E.O.C. v. Skanska USA Bldg., Inc.*, 550 F. App'x 253, 256 (6th Cir. 2013). Deciding whether joint employer status exists requires looking "holistically . . . at the totality of the factors in the aggregate, rather than requiring satisfaction of all the factors. *Edmondson v. Nissan N. Am., Inc.*, No. 3:22-cv-00513, 2024 WL 4635051, at *10 (M.D. Tenn. Oct. 30, 2024) (Crenshaw, J.) (citing *Sanford*, 327 F. App'x at 594).

Here again, in short, nothing in the record suggests that CHIS controlled the day-to-day operations of ACS, dictated the terms and conditions of Hay's employment, including her

compensation and benefits, or had any input in the decisions that led to Hay's termination. The plaintiff's reliance on ACS's use of the trade name "CHS" in many of its materials does not change this analysis, nor does the relationship between ACS and other CHS-affiliated entities or between ACS and CHSPSC—which, again, is not named as a defendant (and which also was not the plaintiff's employer). The plaintiff's unsupported assertions that a "reasonable jury could find that CHS shared or co-determined essential terms and conditions of Plaintiff's employment, including job duties, payroll, benefits, policies, discipline, and supervision" (Doc. No. 51 at 19) are simply that—unsupported assertions. The plaintiff has not shown that CHSI and ACS operated as the plaintiff's joint employer.

### 3.   *Agency*

Simple agency law may also form the basis of liability on the part of an entity that did not actually employ a plaintiff. Thus, this "third approach examines whether the person or entity that took the allegedly illegal employment action was acting as the agent of another company, which may then be held liable as the plaintiffs' employer." *Swallows*, 128 F.3d at 993 (citing *Deal v. State Farm Cty. Mut. Ins. Co. of Tex.*, 5 F.3d 117 (5th Cir. 1993)). "An agent is one who consents to act on behalf of another and subject to the other's control." *Id.* at 996 (citing *Restatement (Second) of Agency* § 1 (1958)); *see also, e.g.*, 29 U.S.C. § 2611(4)(A)(ii)(I) (defining "employer" under the FMLA as including "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer"). "An agent within the context of the ADEA and other employment discrimination statutes must be an agent with respect to employment practices." *Swallows*, 128 F.3d at 996.

The plaintiff argues that agency law provides for a claim against CHSI, because

ACS works solely with CHS affiliates and for the direct or indirect benefit of CHS. While other entities controlled other aspects of Plaintiff's employment, ACS's personnel were given the authority to make the final decision about ending

> Plaintiff's employment, which was then communicated by CHSPSC personnel. For these and the reasons stated above, again, a reasonable juror could conclude that the reason that ACS, CHSPSC, and CHS/CHSI were all making decisions about Plaintiff's employment is that they were all acting as agents of CHS, Inc.

(Doc. No. 51 at 19–20 (internal record citations omitted).) In other words, the plaintiff continues to conflate CHS with CHSI. Regardless, she effectively concedes here that ACS employees made the decision to terminate her employment, while CHSPSC employees, as agents of ACS, communicated that decision to the plaintiff. None of this establishes that ACS functioned as an agent of CHSI.

The plaintiff has failed to present any actual evidence from which a reasonable jury could conclude that ACS functioned as an agent of CHSI with respect to its employment practices.

### C. Conclusion – CHSI's Motion for Summary Judgment

CHSI is entitled to summary judgment on the basis that it was not Hay's employer, and the plaintiff has failed to establish that it should nonetheless be deemed her employer, for purposes of liability under the FLSA or Title VII, under the joint-employer doctrine, the integrated-enterprise/single employer doctrine, or ordinary agency principles.

## V. CONCLUSION

As set forth herein, CHSI's motion (Doc. No. 34) will be granted in its entirety, and all claims against CHSI will be dismissed. ACS's motion (Doc. No. 31) will be granted in part and denied in part. An appropriate Order is filed herewith.

ALETA A. TRAUGER
United States District Judge